[Cite as *Ray v. Hidden Harbour Assn., Inc.*, 2018-Ohio-324.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

Brenda A. Ray, Trustee

    Appellant

v.

Hidden Harbour Association, Inc., et al.

    Appellees

Court of Appeals No. L-17-1022

Trial Court No. CI0201401451

**<u>DECISION AND JUDGMENT</u>**

Decided: January 26, 2018

* * * * *

Brenda A. Ray, for appellant.

Timothy C. James, Matthew T. Davis, and Paul T. Belazis, for appellees.

* * * * *

**JENSEN, P.J.**

{¶ 1} Plaintiff-appellant, Brenda A. Ray, trustee, is the owner of a home in the
Hidden Harbour subdivision in Lucas County, Ohio. She appeals from the January 3,
2017 judgment of the Lucas County Court of Common Pleas granting summary judgment
in favor of Hidden Harbour Association, Inc., Doug Baumgartner, Karen Soubeyrand,
Frank Boyk, John McCarty, Fred Kvasnicka, Don Beyer, and Linda Sobo (collectively

referred to as the "Hidden Harbour defendants"), and appellant's next door neighbors, Robert and Farah Wolfe. For the reasons that follow, we affirm the decision of the trial court.

{¶ 2} The Hidden Harbour subdivision is a planned community subject to the provisions of R.C. 5312. The community is governed by the Hidden Harbour Association, Inc., aka the Hidden Harbour Homeowners Association, Inc. (the "HOA"), an Ohio non-profit corporation, through its elected board of trustees (Doug Baumgartner, Karen Soubeyrand, Frank Boyk, John McCarty, Fred Kvasnicka, Don Beyer, and Linda Sobo) and pursuant to a Declaration of Restrictions and Code of Regulations.

{¶ 3} Relevant to this appeal, Section 1.6 of the Declaration provides:

No fence, hedge, wall or enclosure of any kind, for any purposes shall be erected, placed or suffered to remain upon, in or at the rear yard of any Hidden Harbour Lake Lot, any Moon Lake Lot or any Pond Lot. No fence, ledge, wall or enclosure of any kind, for any purposes, shall be erected without the prior written consent of the Architectural Control Committee. Which consent, if granted, shall establish terms and conditions as to the type, height, width, color and upkeep of the fence, hedge, wall or enclosure and any general conditions pertaining thereto.

{¶ 4} Also relevant to this appeal, Section 1.7 of the Declaration provides:

Without limiting the generality of any other restrictions herein, no row plantings or groupings or rows of trees, shrubs or other plantings shall be permitted in the rear yard of any Hidden Harbour Lake Lot or any Pond

2.

Lot that (a) exceed two (2) feet in height at any time, or (b) would block, obstruct or detract from any other lot's view of Hidden Harbour Lake, Moon Lake or the Pond.

**{¶ 5}** Both Appellant and her next door neighbors, the Wolfes, own and reside on Hidden Harbour Lake lots.

**{¶ 6}** On April 30, 2012, the Wolfes sent an email to Doug Baumgartner, president of the HOA, inquiring about the community's fencing regulations. At President Baumgartner's request, the HOA's property manager, Erin Osstifin, informed the Wolfes that rear yard fences were not allowed on the community's lake lots, but that with approval from the HOA's Architectural Control Committee, they may be allowed to install a fence in their front or side yards.

**{¶ 7}** Notwithstanding the community's rear yard fence prohibition, on June 25, 2012, the Wolfes sent an email to Ms. Osstifin stating:

> We wanted to write and let you know that we have made a decision to install a fence for the safety of our young family. With a toddler and a newborn, we feel the dangers of drowning are a serious and very real threat to the lives of our children. We understand the rules of the association do not allow fences. The fence we plan to install will be 4 ft black wrought iron fence that will not be highly visible. We are willing to remove the fence at the association's request when our children get to an age where we feel they are proficient swimmers and understand the dangers of water

3.

fully; or if we are to move before then. Please feel free to forward this

email to whoever you feel pertinent.

The Wolfes' email was forwarded to President Baumgartner who then instructed Ms. Osstifin to notify the Wolfes that installation of a fence without submitting an application to the HOA's Architectural Control Committee would result in fines and liens upon the property.

{¶ 8} On June 27, 2012, the Wolfes sent an email to the property manager indicating: "we are were willing to accept input and make accommodations if they are given in a timely manner, but ultimately we see no alternative for protecting our children. * * * We will consult with our attorney for additional guidance tomorrow."

{¶ 9} On June 29, 2012, the Wolfes submitted an application to the HOA's Architectural Control Committee requesting permission to install a 36 inch fence in the rear yard of their lot. On July 8, 2012, the HOA president, property manager, and two board members met with the Wolfes reiterating the community's prohibition on rear yard fences. The following day, the HOA's Architectural Control Committee denied the Wolfes' June 29, 2012 application.

{¶ 10} On May 8, 2013, the Wolfes submitted an application to the HOA's Architectural Control Committee requesting permission install a landscaping barrier in the rear yard of their lot. The landscaping proposed did not exceed 24 inches in height. The HOA's Architectural Control Committee approved the application.

{¶ 11} On May 15, 2013, the Wolfes submitted an application to the Architectural Control Committee requesting permission to install a perimeter fence. This time,

4.

however, the request referenced their oldest daughter's "well documented disability." The Wolfes stated that according to the Federal Fair Housing Amendments Act ("FHHA"), "reasonable accommodations can be made" to allow the fence. The Wolfes further stated: "[The FHAA] supersedes the regulations of this community, which should allay any concerns you had about lawsuits from neighbors."

{¶ 12} Upon receipt of the Wolfes' May 15, 2013 application, President Baumgartner (a member of the HOA's Architectural Control Committee) asked the Wolfes to provide documentation regarding their daughter's disability. He also asked the Wolfes to indicate the specific sections of the FHAA they relied upon in seeking the accommodation.

{¶ 13} On May 28, 2013, the Wolfes emailed their interpretation of the FHAA to President Baumgartner. Attached to the email were copies of letters from four of their daughter's health-care providers.

{¶ 14} A letter from Mary Ellen Pizza, M.D., states that J.W. had been diagnosed with "global developmental delay and hypotonia." Dr. Pizza explained, "These delays are demonstrated by limited cognition and severe motor and language delays." Dr. Pizza opined, "Due to [J.W.'s] current decreased abilities she may have limited understanding of physical dangers and difficulties in motor skills to avoid such dangers. She needs to be provided with a safe environment."

{¶ 15} Stephanie Blessing, EIS, M.Ed., is an Early Intervention Specialist at the Lucas County Board of Development Disabilities. At the time of the undated letter, Ms. Blessing was working with [J.W.] and her family. In her letter, Ms. Blessing states:

5.

I am writing this letter to verify that [J.W.] qualifies as a child with a disability under Federal Part C regulations. * * * Her initial evaluation was completed on October 18, 2012 and she was significantly delayed in developmental areas of communication, motor, adaptive and cognitive. [J.W.] also shows a moderate delay in the area of social-emotional development.

{¶ 16} Cecilia Dunn M.A. is a speech/language pathologist at Toledo Hospital. In a letter dated May 13, 2013, Ms. Dunn states:

I am writing in regard to my client [J.W.]. [J.W.] is a 2 year 5 month old female diagnosed with developmental delays which include a significant speech and language disorder. Serious safety concerns are evident as a result of her developmental delays. At this time, she does not have the cognitive skills to distinguish safe behavior from unsafe behavior as would other typically developing 2 year olds. In addition, [J.W.] is a sensory seeking child (positive and negative). Her sensory delays limit her body to perceive danger and may even seek out those dangerous situations that typically developing children have an innate sense that could harm them. [J.W.] also has a significan speech and language delay that prohibits her from alerting care providers of a harmful situation. At this time she is unable to call for help or cry out for assistance in a dangerous situation. During therapy activities, [J.W.] has demonstrated her attraction to water activities and seeks out water play whenever available. As a result, access

to a large body of water without barrier poses an extreme safety risk to her well being. As we are all aware of, accidents can occur in a split second to even the most diligent of parent. I urge you to allow the family to provide a barrier to prevent a harmful situation from occurring.

{¶ 17} Michelle Lemon, PT, MPT is employed by Rehab Dynamics. In a letter dated May 8, 2013, Ms. Lemons states:

[J.W.] * * * has special needs and is being treated for developmental delays. She has a difficulty with safety, balance, and ambulation and is cognitively delayed. The family and [J.W.'s] care takers have concerns that she would not be able to play safely in their yard without a fence. Outside play is very important for developmental growth and progression of physical and mental skills. It is in the best interest for the Wolf family to be able to safely play in their yard without fear of danger, and a fence would provide the barrier needed to keep June secure as she continues to making gains towards her developmental goals.

{¶ 18} At the HOA's June 11, 2013 meeting, HOA board members discussed the Wolfes' request for accommodation. They agreed to approve placement of a perimeter fence subject to a number of conditions. On June 25, 2013, President Baumgartner signed an Architectural Review Committee Request Form approving the installation of "Front & Lakeside Fencing" on the Wolfes' property provided the Wolfes sign a written, recorded agreement acknowledging the Board's conditions.

7.

{¶ 19} In an agreement recorded in the office of the Lucas County Recorder on October 31, 2013, the parties acknowledged that the fence will be removed by the Wolfes "[p]rior to any sale, conveyance, assignment or transfer" or in the event that "a certain medical necessity no longer exists or [the Wolfes'] children reach the age of majority."[1] The agreement also indicated that "[a]n Annual medical evaluation shall be provided to the [HOA] Board of Trustees documenting continuing disability by July 1 each year" and that "[i]f the documentation is not provided timely, the Fence shall be taken down and removed at [the Wolfes'] expense." Shortly thereafter, the Wolfes installed a three-foot high, wrought iron fence around the periphery of their lot.

{¶ 20} After construction of the fence was complete, appellant contacted the HOA's property manager by email. She wanted to make sure the Board had addressed what she believed to be a clear violation of the community's prohibition against rear-yard fences. Shortly thereafter, President Baumgartner contacted appellant and informed her that the Wolfes had been granted permission to install the fence in response to their request for an accommodation under the FHAA. Appellant expressed her displeasure with the decision and condemned the Board's failure to notify her before the variance was granted. Appellant invited the board to her home to see the "unsightly" view the

---

[1] In the trial court, the parties agreed that the written agreement should not have referenced all of the Wolfes' children, only J.W. The parties further agreed that the recorded agreement should be amended to correct the error. A stipulated order correcting the error was submitted by the parties and approved by the court. Accordingly, all arguments concerning the Board's error in this regard are moot.

8.

fence created. Appellant then demanded the board provide her with copies of medical documentation submitted by the Wolfes. They board refused.

{¶ 21} On February 12, 2014, appellant filed a complaint for declaratory judgment alleging the HOA board breached their fiduciary duties by granting an accommodation in conflict with the HOA's restriction on rear yard fences. The complaint sought damages and injunctive relief.

{¶ 22} In May, 2014, and June, 2015, the Wolfes submitted documentation to the HOA indicating a continuation of J.W.'s disability. Both documents were authored by J.W.'s pediatrician, Mary Ellen Pizza, M.D., and indicate a diagnosis of "global developmental delay, hypotonia and partial absence of corpus callasum." In the 2014 letter, Dr. Pizza opines that that J.W. "has a difficult time understanding dangers, problem solving and her poor motor skill create difficulty avoiding dangers." In the 2015 letter, Dr. Pizza indicates that J.W. "has great difficulty with reasoning and problem solving (thus is unable to recognize dangers). She also has clumsiness and poor co-ordination (and thus more difficulty avoiding dangers." In both letters, Dr. Pizza references a need for a continuation of "a safe environment" while the 2015 letter specifically requests the allowance of "a fence as a barrier for [J.W.] from the lake."

{¶ 23} On June 3, 2016 the Wolfes filed a motion for summary judgment asserting they had met their fiduciary duties to the members of the HOA. Four days later, the Hidden Harbour defendants filed a motion for summary judgment asserting similar claims. In a decision granting summary judgment on behalf of the Wolfes and the Hidden Harbour defendants, the trial court opined that "a reasonable jury could not

9.

conclude that the Hidden Harbour defendants conducted an incomplete or bad faith investigation or breached any duty imposed upon them under state law in considering and granting the Wolfes' request for a variance."   This appeal followed.

{¶ 24} Appellant asserts three assignments of error for our review:

1.  Did the trial court err in finding that the Homeowners' Association Board satisfied its duty to the Plaintiff in its handling of the Wolfes' request for the fence variance?

2.  Did the trial court err in overlooking genuine issues of material fact regarding the reasonableness of the Homeowners' Association Boards' reliance on the medical provider statement statements by the Wolfes to justify their request for a fence variance?

3.  Did the trial court err in assuming that denial of defendants' motions for summary judgment would automatically create a claim of disability discrimination against the Association for failure to accommodate under the Federal Fair Housing Act Amendments?

**The Fair Housing Amendments Act**

{¶ 25} Section Six of the Fair Housing Amendments Act of 1988 ("FHAA"), P.L. 100-430, 102 Stat. 1620, 42 U.S.C. 3604(f)(1) makes it unlawful "to discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of -- (A) that buyer or renter,[;] (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or (C) any person associated with that buyer or renter."

10.

**{¶ 26}** The code defines discrimination to include "a refusal to permit, at the expense of the handicapped person, reasonable modifications of existing premises occupied or to be occupied by such person if such modifications may be necessary to afford such person full enjoyment of the premises." 42 U.S.C. 3604(f)(3)(A). It also defines discrimination as "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. 3604(f)(3)(B).

### Standard of Review

**{¶ 27}** We note at the outset that an appellate court reviews the trial court's grant or denial of summary judgment de novo, applying the same standard used by the trial court. *Lorain Natl. Bank v. Saratoga Apts.*, 61 Ohio App.3d 127, 129, 572 N.E.2d 198 (9th Dist. 1989); *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Summary judgment will be granted when there remains no genuine issue of material fact and, when construing the evidence most strongly in favor of the non-moving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. Civ.R. 56(C).

**{¶ 28}** "[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." *Dresher v. Burt*, 75 Ohio St.3d 280, 296, 662 N.E.2d 264 (1996). The nonmoving party has the reciprocal burden of specificity and cannot rest on the mere allegations or denials in the pleadings. *Id.* at 293.

{¶ 29} In ruling on a motion for summary judgment, the court is not permitted to "weigh the evidence before it or choose between competing inferences in reaching [its] decision." *Cincinnati v. Ohio Council 8, Am. Fedn. of State, Cty. & Mun. Emp., AFL-CIO*, 93 Ohio App.3d 162, 164, 638 N.E.2d 94 (1st Dist.1994), citing *Mitseff v. Wheeler*, 38 Ohio St.3d 112, 526 N.E.2d 798 (1988).

{¶ 30} With these standards in mind, we will address appellant's three assignment of error.

### First Assignment of Error

{¶ 31} In her first assignment of error, appellant asserts: "The trial court erred in finding that the [HOA] Board satisfied its duty to the Plaintiff in its handling of the Wolfes' request for the fence variance."

{¶ 32} To state a claim for breach of fiduciary duty, a plaintiff must allege the existence of a fiduciary duty, the breach of that duty, and damages proximately caused therefrom. *Camp St. Mary's Assn. of the W. Ohio Conference of the United Methodist Church, Inc. v. Otterbein Homes*, 176 Ohio App.3d 54, 2008-Ohio-1490, 889 N.E.2d 1066 (3d Dist.)

{¶ 33} R.C. 1702.30 imposes fiduciary duties on directors of nonprofit corporations. R.C. 1702.30(B) provides:

> A director shall perform the duties of a director * * * in good faith, in a manner the director reasonably believes to be in or not opposed to the best interests of the corporation, and with the care that an ordinary prudent person in a like position would use under similar circumstances.

12.

**A. The Alleged Failure of the Board to Follow the HOA's Dispute Resolution Procedure Was Not a Breach of Fiduciary Duty.**

{¶ 34} In her first argument under her first assignment of error, appellant asserts: "[t]he Board failed to follow its own procedures for resolution of a disputed variance from the deed restrictions." Appellant further argues that before granting permission for a rear yard fence, the HOA should have informed her of the Wolfes' request for a variance.

{¶ 35} The HOA's dispute resolution policy is set forth in a document entitled "Process to Resolve Alleged Restriction and Rule Violations." The policy encourages homeowners to utilize a four-step process to resolve alleged violations of the association's rules and restrictions. Because the Wolfes' May 15, 2013 request for approval for the construction of a perimeter fence was a request for a reasonable accommodation under the FHAA, neither the request nor its subsequent approval triggered the association's dispute resolution policy. Moreover, the HOA had no affirmative duty under the HOA's governing documents or state law to inform the Wolfes' next door neighbors that it was considering a request for accommodation under the FHAA. Thus, appellant's first argument under her first assignment of error is not well-taken.

**B. The Alleged Failure of the Board to Enforce the Deed Restrictions by Failing to Investigate Possible Alternatives to a Wrought Iron Fence was not a Breach of Fiduciary Duty.**

{¶ 36} In her second argument under her first assignment of error, appellant asserts: "the Board failed in its duty to enforce the deed restriction." She contends that

13.

the Board's breach of fiduciary duty is directly related to its misunderstanding of the rear yard fence prohibition set forth in Section 1.6 of the declaration. Appellant opines that in order to fulfill its fiduciary obligations the board was required to "investigate possible alternatives which would have conformed to the deed restrictions rather than simply accepting the Wolfes' demand for a perimeter fence at face value."

{¶ 37} In response, the Hidden Harbour defendants acknowledge that the HOA's Declaration prohibits rear-yard fences. They reject the appellant's assertion that they "simply accept[ed] the Wolfes' demand." Rather, the Hidden Harbour defendants contend that they met their fiduciary obligations to the members of the HOA by evaluating the Wolfes' May 15, 2013 request for accommodation "in compliance with federal statutes." They further contend they had no affirmative duty to "investigate possible alternatives" to the requested perimeter fence.

{¶ 38} It is undisputed that the FHAA imposes an affirmative duty on the HOA to provide reasonable accommodations necessary to afford disabled individuals equal opportunity to enjoy the housing of their choice. 42 U.S.C. 3604(f)(3)(b). *See Brank v. Ineichen*, 54 F.3d 425, 429 (7th Cir.1995) ("the concept of necessity requires at a minimum the showing that the desired accommodation will affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability."). Under the FHAA, an accommodation is reasonable unless it requires "a fundamental alteration in the nature of a program" or imposes "undue financial or administrative burdens" on the housing provider. *Smith & Lee Assocs. v. City of Taylor*, 102 F.3d 781, 795, (6th Cir.

14.

1996), citing *Southeastern Community College v. Davis*, 442 U.S. 397, 410, 60 L.Ed.2 980, 99 S.Ct. 2361 (1979).

{¶ 39} In their motion for summary judgment, the Hidden Harbour defendants contend that their response to the Wolfes' May 15, 2013 request was lawful and consistent with the recommendations set forth in a joint policy statement issued by the Department of Housing and Urban Development and the Department of Justice ("Joint Statement"). *See Overlook Mutual Homes, Inc.  v. Spencer*, 415 Fed. Appx. 617, 621 (6th Cir.2011).  *See also* Joint Statement of the Department of Housing and Urban Development and the Department of Justice Reasonable Accommodations Under the Fair Housing Act (May 14, 2004), https://www.justice.gov/crt/us-department-housing-and-urban-development (accessed December 28, 2017).

{¶ 40} The Hidden Harbour defendants allege that while the Joint Statement promotes discussion of alternate accommodations, it also provides that the individual requesting the accommodation is better equipped to determine what reasonable accommodation will suit their needs.  Page 8 of the Joint Statement states:

> There may be instances where a provider believes that, while the accommodation requested by an individual is reasonable, there is an alternative accommodation that would be equally effective in meeting the individual's disability-related needs.  In such a circumstance, the provider should discuss with the individual if she is willing to accept the alternative accommodation.  However, providers should be aware that persons with disabilities typically have the most accurate knowledge about the functional

15.

limitations posed by their disability, and an individual is not obligated to accept an alternative accommodation suggested by the provider if she believes it will not meet her needs and her preferred accommodation is reasonable.

The Hidden Harbour defendants assert that in granting the Wolfes' request for accommodation they acted in a manner consistent with their obligations under the FHAA, as expressed in the Joint Statement.

{¶ 41} There is no evidence before this court that the accommodation requested by the Wolfes – and ultimately granted by the Hidden Harbour defendants – required a "fundamental alteration" in the nature of the HOA nor is there any evidence that the requested accommodation imposed an "undue financial or administrative burden" on the association. In regard to the former, President Baumgartner testified that two lot owners at the HOA had erected fences in their rear yard; both lots were located on a cove just off the main lake and the respective owners had each been granted special permission by the developer to install a fence. Thus, the Wolfes' lot was not the only lot in the subdivision with a rear yard fence. In regard to the latter, it is clear that the Board incurred some time and expense in drafting and recording the written agreement documenting the conditions upon which the "variance" was granted. The board also took upon itself the additional administrative obligation of an annual review of the Wolfes' supporting medical documentation. Thus, a reasonable trier of fact could only conclude that the perimeter fence constitutes a "reasonable accommodation."

**{¶ 42}** Contrary to the Hidden Harbour defendants' assertions, a summary judgment examination into whether they breached their fiduciary duty to the members of the association is not extinguished by introduction of evidence that the granted accommodation was reasonable and complies with the fundamental principles of the FHAA. As stated above, R.C. 1702.30(B) requires the members of the board to perform their duties "in good faith, *in a manner the director reasonably believes to be in or not opposed to the best interests of the corporation*, and with the care that an ordinary prudent person in a like position would use under similar circumstances."

**{¶ 43}** In *Robinson v City of Friendswood*, 890 F.Supp. 616, 621 (S.D.Texas 1995), the court held that when a request for an accommodation involves a zoning regulation, a municipality is required to balance the interest of and benefit to the handicapped individual against the interest of and burden to the municipality. *See also Smith & Lee Assoc. v. City of Taylor*, 13 F.3d 920, 931 (6th Cir. 1993) ("We balance the City's interests against the need for an accommodation in this case.").

**{¶ 44}** We believe the board's duty to perform "in the best interests of the corporation" requires a similar balancing test. Thus, in order to meet their fiduciary obligations to the members of the HOA, the Hidden Harbour defendants were required, when considering the requested accommodation, to balance the interests of and benefits to the handicapped individual against the interests of and burdens to the HOA. The Hidden Harbour defendants were under no affirmative requirement to consider alternatives to the Wolfes' May 15, 2013 request for a perimeter fence.

17.

**{¶ 45}** In their motion for summary judgment – without specifically articulating the requisite balancing test – the Hidden Harbour defendants identified portions of the record demonstrating that they considered the requested accommodation while balancing the interests of and benefits to J.W., against the interest of and burdens to the HOA.

**{¶ 46}** HOA president Doug Baumgartner testified that upon receiving the Wolfes' May 15, 2013 request for accommodation, he required the Wolfes provide him with documentation of J.W's disability. President Baumgartner testified that he reviewed the documents the Wolfes' produced. In his opinion, the documents appeared to support the existence of a disability and the need for a perimeter fence.

**{¶ 47}** President Baumgartner looked up information about the FHAA on the internet. He then discussed the Wolfes' request for accommodation with the other members of the HOA board. At the June 11, 2013 meeting of the HOA, the board determined that it would approve the Wolfes' request for a perimeter fence subject to three conditions: (1) the Wolfes maintain the fence while erected and remove the fence prior to any "sale, conveyance, assignment or transfer" of the property; (2) the Wolfes remove the fence if and when the medical necessity for the fence no longer exists; and (3) the Wolfes remove the fence when J.W. reaches the age of maturity. Thus, the approved accommodation was a *temporary* variance that expired when J.W.'s disability no longer necessitated the fence, or upon her 18th birthday, whichever was earlier.

**{¶ 48}** During his deposition, the HOA President opined that from the beginning, the Wolfes "try[ed] to compel [the board] to see their side of the story about the safety of their children." And while the HOA President denied any threat of lawsuit from the

18.

Wolfes, he indicated that the Wolfes appeared willing "to do whatever it took * * * to get that fence."

{¶ 49} Undoubtedly, there might be accommodations *more* reasonable for the HOA (and *more* palatable to the Wolfes' next door neighbor). It is also possible that a family determined to protect its disabled child would cause the HOA great expense in defending a decision to deny the requested accommodation and enforce its restrictive covenants.

{¶ 50} Here, the uncontroverted evidence reveals that the Board considered the request in good faith and conditioned approval of a temporary perimeter fence upon the Wolfes' agreeing to meet three conditions beneficial to the HOA. Contrary to appellant's argument, the board did not "simply accept[] the Wolfes' demand."

{¶ 51} Appellant's second argument under her first assignment of error fails for two reasons: (1) the board did not have an affirmative duty to "investigate possible alternatives" to the requested accommodation, and (2) appellant has failed to introduce any evidence contrary to the evidence introduced by the moving party that the board's decision making process met the requisite balancing test.

{¶ 52} Construing the evidence in a light most favorable to the non-moving party, we find that reasonable minds can come to but one conclusion, the Hidden Harbour defendants did not violate their fiduciary obligations to its members by "failing to enforce the community's deed restrictions." Rather, the uncontroverted evidence shows that the Hidden Harbour defendants performed their duties in responding to a request for a reasonable accommodation under the FHAA in good faith, in a manner they reasonably

19.

believed to be in or not opposed to the best interests of the corporation, and with the care that an ordinary prudent person in a like position would use under similar circumstances. Therefore, we find appellant's second argument under her first assignment of error not well taken.

### C. The board did not breach its fiduciary duty by failing to "contact someone with knowledge in the field" before granting the FHAA request for reasonable accommodation.

{¶ 53} In her third argument under her first assignment of error, appellant asserts that "[t]he Board failed to conduct a reasonable inquiry into the medical necessity for the requested accommodation and its reasonable duration."

{¶ 54} Here, appellant first argues that, given the complexity of the FHAA, "it would have been reasonable for an ordinarily prudent person" in President Baumgartner's position, "to contact someone with knowledge in the field" before granting the request for accommodation. While we agree that the FHAA is complex and the decisions interpreting its provisions diverse, we do not agree that R.C. 1702.30(B) would require the Board to consult with an attorney. President Baumgartner looked up the FHAA on the internet and both he and at least one other member of the board read case law interpreting the Act. The Ohio Revised Code allowed the Hidden Harbour defendants, to "rely on information, opinions, reports or statements" prepared by "counsel, public accountants, or other persons as to matters that the director reasonably believes are within the persons' professional or expert competence[.]" R.C. 1702.30(B)(2).

20.

**{¶ 55}** In her second argument, appellant asserts that the Board was obligated to consult with "an independent physician" to review the medical information provided by J.W.'s providers. We disagree.

**{¶ 56}** The Joint Statement states:

A housing provider may not ordinarily inquire as to the nature and severity of an individual's disability. However, in response to a request for a reasonable accommodation, a housing provider may request reliable disability-related information that (1) is necessary to verify that the person meets the Act's definition of disability * * *; (2) describes the needed accommodation; and (3) shows the relationship between the persons' disability and need for the requested accommodation.

**{¶ 57}** While evaluating the Wolfes' request for accommodation, President Baumgartner testified that he relied upon the expert opinion of J.W.'s medical providers that an accommodation was necessary. Given this testimony, appellant was required to produce evidence that President Baumgartner's reliance upon the opinions of the medical providers was inconsistent "with the care that an ordinarily prudent person in a like position would use under similar circumstances." She introduced no such evidence.

**{¶ 58}** In regard to the duration of the accommodation, appellant asserts that the Hidden Harbour defendants should "seek additional information for the continued need for the fence." However, the agreement entered into by the Wolfes required only that they submit "an annual medical evaluation * * * documenting continuing disability."

21.

There is no evidence before the court that the board has failed to review, in good faith, the annual reports submitted by the Wolfes documenting a continuing disability.

{¶ 59} Construing the evidence in a light most favorable to the non-moving party, we find that reasonable minds can come to but one conclusion, the Hidden Harbour defendants did not violate their fiduciary obligations to its members by reading the FHAA and case law interpreting the Act, nor did they violate their obligations by relying on documentation provided J.W.'s health care providers. Accordingly, appellant's third argument under her first assignment of error is not well-taken.

## Second Assignment of Error

{¶ 60} In her second assignment of error, appellant asserts: "The trial court erred in overlooking genuine issues of material fact regarding the reasonableness of the Homeowners' Association Board's reliance on the medical provider statements submitted by the Wolfes to justify their request for a fence variance." Appellant argues that given only one of the four opinions provided by J.W.'s medical providers came from a "physician," the Board should have "requested further information to support the claimed necessity for the fence variance." She contends, "President Baumgartner simply took the letters from each medical provider at face value because they seemed to have the appropriate qualifications for the opinions they rendered."

{¶ 61} In their motion for summary judgment, the board argued that "it was decidedly reasonable for the Board to limit its inquiry to confirmation of [J.W.'s] disability and the need for the accommodation. To hold otherwise would require the

22.

Board to violate existing law, a clearly unreasonable act." The Wolfes made a similar argument in their motion for summary judgment.

{¶ 62} In response to President Baumgartner's request for medical documentation, the Wolfes submitted four letters from J.W.'s medical and service providers. President Baumgartner admitted that he did not question the documents' authors, nor did he conduct any type of investigation into J.W.'s medical status. Rather, he took the documents at "face value." The HOA president opined, "[the medical providers] seemed to have the credentials to be able to diagnose what the child had."

{¶ 63} It was not a breach of fiduciary duty for the Hidden Harbour defendants to rely on the opinions of medical experts when considering whether J.W. qualified for an accommodation under the FHAA. As stated above, the Joint Statement provides that a "housing provider may not ordinarily inquire as to the nature and severity of an individual's disability." Rather, information that the person meets the FHAA's definition of disability "can usually be provided by the individual." However, the Joint Statement also provides that "[a] doctor or other medical professional, a peer support group, a non-medical service agency, or a reliable third party who is in a position to know about the individual's disability may * * * provide verification of a disability."

{¶ 64} Under the FHAA, to fall within the definition of "handicap," a person must: (1) have a physical or mental impairment which substantially limits one or more of such person's major life activities; (2) have record of having such an impairment; and (3) be regarded as having such an impairment. 42 U.S.C. 3602(h). The regulations

23.

interpreting the FHAA specify that the term physical or mental impairment includes, among other things:

> [a]ny physiological disorder or condition * * * affecting one or more of the following body systems: Neurological; musculoskeletal, special sense organs; respiratory, including speech organs; cardiovascular; * * * or * * * [a]ny mental or psychological disorder, such as mental retardation * * * and specific learning disabilities.  The term physical or mental impairment includes, but is not limited to, such diseases and conditions as orthopedic, visual, speech and hearing impairments * * *. 24 C.F.R. 100.201(a)(1) and (2).

{¶ 65} Construing the evidence in a light most favorable to the non-moving party, we find that reasonable minds can come to but one conclusion, the Hidden Harbour defendants did not violate their fiduciary obligations by relying on the opinions provided to them by J.W's care providers when they determined that J.W. was a disabled person under the FHAA and that a barrier was needed in order for J.W. to fully enjoy the lake-front property.  Accordingly, appellant's second assignment of error is not well-taken.

### Third Assignment of Error

{¶ 66} In her third assignment of error, appellant asserts: "The trial court erred in assuming that denial of defendants' motions for summary judgment would automatically create a claim of disability discrimination against the Association for failure to accommodate under the Federal Fair Housing Act Amendments."

24.

{¶ 67} In the lower court, the Toledo Fair Housing Center and that Ability Center of Greater Toledo were granted leave to jointly file an amicus brief in support of defendants' motions for summary judgment. When granting the defendants' motions for summary judgment, the trial court briefly discussed the arguments made by the Centers. The trial court indicated that it appreciated the Centers' "prescient arguments" regarding the "invalidity of any state-law judgment that compels or authorizes the Association to act in violation of the [FHAA]." The trial court concluded, however, that "[t]his is not a fair housing case." Nonetheless, the trial court speculated, "[a] denial of summary judgment with respect to the granting of the variance would prospectively allow its annulment, thus implicating and rendering defendants aggrieved persons under the Fair Housing Act."

{¶ 68} On appeal, appellant suggests that the amicus brief filed jointly by the Centers "had a significant influence on the Court's decision." She then reasserts arguments made in her first and second assignments of error.

{¶ 69} As stated earlier in this decision, appellate review of a trial court's ruling on a motion for summary judgment is de novo. Thus, the trial court's opinion has no bearing or influence on this court's consideration of the same.

{¶ 70} Having articulated no new argument in her third assignment of error, we find the arguments asserted therein are moot. Appellant's third assignment of error is not well-taken.

25.

**CONCLUSION**

**{¶ 71}** Based on the foregoing, the judgment of the Lucas County Court of Common Pleas is affirmed.  Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24(A).

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Mark L. Pietrykowski, J.

Arlene Singer, J.

James D. Jensen, J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE